CLERKS OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
1/10/18
JULIA C. DUDLEY, CLERK
BY: s/ K. DOTSON
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| SANDRA ANN BERGDOLL, ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 5:16-cv-00069 |
| v. ) | |
| ) | MEMORANDUM OPINION |
| NANCY A. BERRYHILL, ) | |
| Acting Commissioner of ) | |
| Social Security, ) | By:    Joel C. Hoppe |
| Defendant. ) | United States Magistrate Judge |

Plaintiff Sandra Ann Bergdoll asks this Court to review the Acting Commissioner of Social Security's ("Commissioner") final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by the parties' consent under 28 U.S.C. § 636(c)(1). ECF No. 6. Having considered the administrative record, the parties' briefs, and the applicable law, I find that substantial evidence supports the Commissioner's decision.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see also Riley v.*

1

*Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62

(1983); 20 C.F.R. § 404.1520(a)(4). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

II. Procedural History

Bergdoll filed for DIB on December 14, 2012, alleging disability caused by left hip injury, right shoulder injury/pain, severe pain, lower back problems, constant pain, rheumatoid arthritis, body tremors, neck pain, and diabetes. Administrative Record ("R.") 39–40, ECF No. 10. Bergdoll alleged onset of disability as October 27, 2011, at which time she was forty-one years old. R. 39. Disability Determination Services ("DDS"), the state agency, denied her claim at the initial, R. 39–51, and reconsideration stages, R. 52–67. On November 2, 2015, Bergdoll appeared with counsel at an administrative hearing before ALJ Mary Peltzer and testified about her impairments, past work, and daily activities. R. 12–37. A vocational expert ("VE") also testified about Bergdoll's past work and her ability to do other jobs in the national economy. R. 32–36.

On January 19, 2016, ALJ Peltzer issued a written decision denying Bergdoll's DIB application. R. 78–93. The ALJ determined that she had not engaged in substantial gainful activity since October 27, 2011. R. 80. She then found that Bergdoll had severe impairments of psoriasis with psoriatic arthropathy, fibromyalgia, lumbar degenerative disc/joint disease, and obesity. *Id.* All other medical conditions were deemed non-severe. R. 80–82. None of these impairments, alone or in combination, met or medically equaled the severity of one of the listed impairments. R. 82. As to Bergdoll's residual functional capacity ("RFC"),[1] ALJ Peltzer

---

[1] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

determined that she could perform sedentary work[2] as defined in the regulations, except that she could frequently balance; occasionally stoop, crouch, and climb stairs and ramps; never kneel, crawl, or climb ladders, ropes, or scaffolds; frequently handle and finger; and never reach overhead with the right upper extremity. R. 83. She also required a static work environment where changes in task were infrequent and explained when they occurred. *Id.* Considering this RFC and the testimony of the VE, the ALJ determined that Bergdoll could not perform her past relevant work as a hospital nurse or as a dental office nurse. R. 92. She could, however, perform other sedentary jobs, including telephone order clerk and inspector/grader, that existed in significant numbers in the national economy. R. 92–93. Therefore, ALJ Peltzer concluded that Bergdoll was not disabled. R. 93. The Appeals Council denied Bergdoll's request for review, R. 1–4, and this appeal followed.

III. Discussion

Bergdoll challenges ALJ Peltzer's RFC finding that she can use her hands to frequently handle and finger. Pl.'s Br. 3–5, ECF No. 14. Bergdoll specifically identifies the opinion of her treating rheumatologist, Matthew S. Hogenmiller, M.D., and her own statements regarding her manipulative limitations as support for her position. *Id.* Bergdoll contends that had the ALJ properly evaluated this evidence, it would have resulted in a finding that she could do no more than occasional handling and fingering. *Id.* at 4–5. Bergdoll asserts that this restriction would erode the occupational base and eliminate the jobs identified by the VE. *Id.* at 3–4.

A.  *Facts*

---

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). A person who can meet those lifting requirements can perform a full range of sedentary work if he or she can sit for about six hours and stand and/or walk for about two hours in a normal eight-hour workday. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002); SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

4

Bergdoll has a history of chronic pain, including pain in her shoulders, arms, hands, neck, cervical spine, lower back, and throughout her various lower extremities. She treated with multiple specialists, was prescribed medications, and was referred to physical therapy and pain management. Because Bergdoll's argument primarily concerns her manipulative limitations of handling and fingering, the discussion of the medical record and her report of symptoms will focus on evidence related to those limitations.

1. *Relevant Medical Evidence*

Bergdoll was involved in a motor vehicle accident on October 27, 2011, R. 302–03, which she claimed exacerbated all her existing pain. Bergdoll was taken to the emergency room following the accident, and she reported back, neck, and left hip pain. R. 302. Bergdoll was discharged with analgesics. R. 303. On November 4, Bergdoll presented to John Marsh, M.D., regarding her pain following the motor vehicle accident. R. 418–21. The review of systems was positive for joint pain, joint swelling, and limb pain. R. 419. She had no extremity edema on physical examination. R. 420. She presented to the University of Virginia Hospital East ("UVA") on November 11 with pain in her shoulder, neck, right knee, and left sacroiliac joint and decreased sensation throughout her arm. R. 396. A physical examination revealed full strength in her shoulders, and cervical spine range of motion was normal. R. 398.

Bergdoll followed up with Dr. Marsh's office on November 18 and treated with Cindy Almarode, N.P., for continued complaints of neck and low back pain. R. 356–58. She endorsed tenderness to palpation at the cervical spine and lumbar spine on examination. R. 357. NP Almarode refilled her Dilaudid and Valium. *Id.* She returned UVA on December 2 complaining of neck pain and right upper extremity pain that radiated into her hand causing numbness and paresthesia of the ulnar 2 1/2 digits. R. 394–95. Bergdoll was limping some, which she attributed

to "sciatica" that had worsened since the car accident. R. 395. Tinel's test at her elbow and cubital tunnel compression test were both negative. *Id.* On December 15, she presented to UVA for evaluation of neck and low back pain. R. 393. She complained of low back pain and pain radiating down her right arm into the third, fourth, and fifth fingers. R. 393. Her neck pain had resolved. *Id.* On physical examination, Bergdoll displayed 5/5 strength for wrist extensors and finger flexors, normal gait, and full range of motion of her neck. R. 394. She had decreased sensation throughout her right forearm. *Id.* X-rays and MRIs of her cervical spine revealed no acute abnormality and some mild degenerative changes without neural foraminal cervical stenosis. R. 394; *see also* R. 395. Imaging of her lumbar spine did not reveal any acute abnormalities. R. 394.

On March 6, 2012, Bergdoll reported to Deana Bahrman, P.A., at UVA that she did "not feel that her neck pain or right upper extremity radiculopathy bother[ed] her," and that she was "more concerned with her low back and left hip pain," for which she took Dilaudid and had been referred to pain management. R. 538. Bergdoll visited Sarah Knievel, M.D., on April 19 for an initial consultation for pain management. R. 843–46. Bergdoll reported experiencing persistent lower back and left extremity pain since her motor vehicle accident. R. 843. She complained primarily of pain in her left lower buttock region radiating to her left thigh, which she called sciatica. R. 843. She did not complain of hand, wrist, or elbow pain, and examination findings and Dr. Knievel's impression focused on Bergdoll's left lower extremity and buttocks pain. R. 843–46. Dr. Knievel prescribed Cymbalta and encouraged her to take less Dilaudid. R. 845–46. Bergdoll reported to Dr. Knievel on May 22 that she could not tolerate the Cymbalta and instead continued with Dilaudid. R. 847.

6

On July 9, Bergdoll followed up with NP Almarode for her back pain and completion of disability paperwork. R. 665. On examination, NP Almarode noted neck, cervical and lumbar spine, and right shoulder tenderness and shoulder pain with range of motion. R. 667. NP Almarode completed a neurological evaluation supplement, R. 579, and range of motion form, R. 580. Bergdoll's range of motion was normal in her bilateral elbows, wrists, hands, and fingers.[3] R. 580. Bergdoll's forearm flexors and extensors were 5/5 on the right and 4/5 on the left, her grip was 3/5 bilaterally, and her manual dexterity was 5/5 bilaterally. R. 579.

Bergdoll returned to Dr. Marsh on January 22, 2013, and reported having continuing joint pain and swelling in her fingers and right wrist, which became worse with use and also in the morning. R. 737–40. She reported a resting tremor and decreased flexion in the fingers, as well as pain and weakness when trying to grasp or lift objects. *Id.* Physical examination revealed tenderness to palpation in the right wrist and bilateral hands, but there was no swelling, ecchymosis, or erythema. R. 739–40. Dr. Marsh diagnosed pain in joint, site unspecified. R. 740. An X-ray of Bergdoll's hands on February 5 was completely normal, with no significant soft tissue, bony, or joint abnormality seen. R. 793. She followed up with NP Almarode on April 4 with continued complaints of joint pain and stiffness. R. 946–50. On physical examination, NP Almarode observed "3/5 (fair)" to "4/5 (good)" strength in the bilateral shoulders, elbows, and wrists, but "2/5 (poor)" strength in the bilateral hands. R. 948. NP Almarode assessed pain in joint, site unspecified (arthralgia), which she noted as stable. R. 949.

Bergdoll presented to Dr. Hogenmiller on May 7, 2013, for an initial consultation regarding joint pain and swelling in the fingers, greater on the right than the left. R. 1095–97. Bergdoll reported a lot of pain in the proximal interphalangeal ("PIP") joints and decreased range

---

[3] NP Almarode did not complete the section for hand-finger range of motion, but the form instructs that it should be completed "only where abnormal." R. 580.

of motion in the metacarpophalangeal ("MCP") joints and distal interphalangeal ("DIP") joints. R. 1095. Dr. Hogenmiller noted that Bergdoll talked about the swelling and inability to use her hands more than she did about the pain itself. *Id.* Bergdoll noted that the pain would wake her up at night. *Id.* On physical examination, Dr. Hogenmiller observed "some definite swelling of the right hand more so than the left." R. 1096. Bergdoll could not make a fist, and she could not fully extend any of the second through fifth digits of her right hand. *Id.* She could fully extend the fourth and fifth digits on her left hand. *Id.* She endorsed tenderness primarily in the PIP joints and some in the MCP joints, but none in the DIP joints. *Id.* There was resistance to passive range of motion in all of these joints. *Id.* Range of motion in her right shoulder was decreased. *Id.* Laboratory data revealed a rheumatoid factor of 9, which Dr. Hogenmiller noted was normal. *Id.* Dr. Hogenmiller explained that Bergdoll had been referred for an evaluation of possible onset of inflammatory arthritis and that she had "some significant swelling in both hands." *Id.* He requested records from other providers, prescribed prednisone, and ordered testing to further aid in his assessment. R. 1096–97.

Bergdoll followed up with Dr. Hogenmiller on June 4 and reported that prednisone was not helpful. R. 1094; *see also* 1158. Dr. Hogenmiller explained that "[h]er chronic pain syndrome [did] make it somewhat difficult to sort out what [was] going on with regard to her hands." R. 1094. He noted that there was not much swelling on examination, but that Bergdoll endorsed severe pain with passive range of motion, especially in the PIP joints on the right hand. *Id.* He also observed a Boutonniere deformity[4] in the right fifth digit. *Id.* Dr. Hogenmiller prescribed a two-week prednisone dose pack to try and achieve substantial pain relief in a short period. *Id.* Bergdoll followed up with Dr. Hogenmiller on September 10 with increased pain

---

[4] "[A] deformity of the finger characterized by flexion of the proximal interphalangeal joint and hyperextension of the distal joint." *Dorland's Illustrated Medical Dictionary* 486 (31st ed. 2007).

8

overall. R. 1143–47. A physical examination revealed PIP tenderness throughout both hands, but no definite swelling; the Boutonniere deformity was still present in the right fifth digit; and her wrists were tender with passive range of motion, but she was able to bear weight on her hands with her wrists extended without significant discomfort. R. 1146. Dr. Hogenmiller started her on Enbrel for inflammatory polyarthropathy. R. 1143.

On October 4, 2013, Dr. Hogenmiller completed an RFC evaluation of Bergdoll's functioning. R. 930–31. He opined that Bergdoll could walk less than one city block; could stand for five to ten minutes at one time; could sit for five minutes to one hour at one time; could sit/stand, alternating as necessary, for five minutes to an hour before needing to lie down; and could lift five pounds at one time. R. 930. Dr. Hogenmiller explained that he first treated Bergdoll in May 2013 and could offer his opinion only as to that time to the present. R. 931. In reaching his conclusions, Dr. Hogenmiller noted that he relied on Bergdoll's "history and more so the physical exam which has been characterized by tenderness throughout both feet and in the proximal interphalangeal joints of both hands." *Id.*

Bergdoll returned to NP Almarode on October 8 with worsening joint pain and swelling. R. 932–36. NP Almarode noted tenderness and decrease in range of motion related to arthritic changes in her hands. R. 935. She also noted tenderness and decreased range of motion in the bilateral upper extremities generally. *Id.* Bergdoll followed up with Dr. Hogenmiller on November 18. R. 1138–42. She again endorsed severe pain with passive range of motion of the hands, specifically in the PIP joints where she also exhibited some mechanical resistance to range of motion. R. 1141.

Bergdoll visited both NP Almarode and Dr. Hogenmiller on January 13, 2014. R. 1119–23, 1132–37. She reported joint pain and arthritis-related problems to NP Almarode. R. 1121. On

9

physical examination, NP Almarode noted that Bergdoll's left and right upper extremities were normal, and she had no arthritic changes to her hands or in any other joints. R. 1122. During her visit with Dr. Hogenmiller, Bergdoll stated that she did not notice any difference in her joint pain since starting Enbrel roughly four weeks earlier. R. 1132. Dr. Hogenmiller noted that she "continue[d] to have a very unusual exam of the hands with no definite synovitis, bilat[eral] PIP deformities and pain with passive [range of motion] of the PIPs especially." R. 1135. He doubted the diagnosis of psoriatic arthropathy and noted that he could "not say for certain that there is a definite inflammatory arthritis present due to the overwhelming nature of her chronic pain condition." R. 1132. Dr. Hogenmiller opined that this diagnosis could be correct if he could find a treatment that made "a profound difference" for Bergdoll, but if not, there was "some persisting possibility that she simply has very unusual manifestations of chronic pain – that is the joint pains in her hands may be the result of chronic underuse due to pain." *Id.* Bergdoll followed up with Dr. Hogenmiller on February 17. R. 1148–52. On physical examination, she could not squeeze either hand into a fist despite having only mild generalized swelling. R. 1151. Most of the small joints in her hands were tender with palpation, and she had right hand 4/5 Boutonniere deformity. *Id.* Dr. Hogenmiller prescribed subcutaneous Cimzia for psoriatic arthropathy. R. 1148.

Bergdoll returned to NP Almarode on September 8, 2015. R. 1272–76. She reported back pain, but denied joint pain or swelling as well as arthritis-related problems in the review of systems. R. 1274. She had been using a TENS unit and continued pain medication. R. 1272. NP Almarode did not evaluate Bergdoll's hands on physical examination, R. 1275, and she recommended treatment with NSAIDs, physical therapy, and water therapy, R. 1272. Bergdoll then treated with Dr. Hogenmiller for the last time on September 24, 2015. R. 1296–1300. Dr.

10

Hogenmiller conducted a limited examination of her hands as Bergdoll resisted because of pain. R. 1299. There was no swelling, but she could not make a closed fist, and all joints as well as the entire hand were tender to palpation. *Id.* Dr. Hogenmiller explained that Bergdoll reportedly had "no response at all to any biologics which casts some doubt on the idea that she has a genuine inflammatory arthritis" and the "exam even of her hands is clouded by chronic pain issues." R. 1296. Dr. Hogenmiller prescribed prednisone, baclofen, and sulindac. R. 1300.

2. *DDS Physicians' Opinions*

Carolina Bacani-Longa, M.D., reviewed Bergdoll's medical records and application materials as part of the initial disability determination. R. 40–47. On June 13, 2013, Dr. Bacani-Longa concluded that Bergdoll could lift and carry fifty pounds occasionally and twenty-five pounds frequently; could sit for about six hours and stand and/or walk for about six hours in an eight-hour workday; and was unlimited in her ability to push and/or pull, other than as shown for lifting and carrying. R. 46–47. Dr. Bacani-Longa assessed no other limitations. R. 47.

On reconsideration, in an opinion dated May 13, 2014, Richard Surrusco, M.D., reassessed Bergdoll's functioning. R. 54–65. He found that Bergdoll could lift and carry twenty pounds occasionally and ten pounds frequently; could sit for about six hours and stand and/or walk for about six hours in an eight-hour workday; and was unlimited in her ability to push and/or pull, other than as shown for lifting and carrying. R. 63. Dr. Surrusco also concluded that Bergdoll had postural limitations and manipulative limitations. R. 64. Specifically, she could frequently balance, stoop, kneel, crouch, and climb ramps and stairs; occasionally crawl and climb ladders, ropes, and scaffolds; frequently reach overhead with the right upper extremity; and frequently use her hands to handle and finger. *Id.* Dr. Surrusco explained that Bergdoll had a

history of right shoulder surgery and some hand weakness, although recent exams revealed good grip strength and no sign of hand tremors. *Id.*

      3.      *Bergdoll's Report of Symptoms and Testimony*

Bergdoll completed three pain questionnaires, R. 209–10, 235–36, 256–57, and three function reports, R. 214–24, 238–45, 261–68, as part of her application for benefits. She explained that the joints in her hands and fingers were swollen and painful. R. 209, 235. She could not move all her fingers, straighten them, or make a fist. R. 256. Her hand problems made personal care difficult. R. 218, 239, 262. For example, hand tremors caused her to spill things on herself, R. 239, 262, and she found it difficult to get dressed and care for her hair, R. 218, 262. She did not do house or yard work because of her hand problems. R. 220, 241, 264. She could not hold or grip coins and money. R. 221, 241–42, 264–65. She did not drive because she was unable to grasp the steering wheel. R. 264. She also had problems opening pill bottles and gripping objects. R. 240, 262. She could not close her hands and frequently dropped things. R. 224, 266. She stated in her last function report that she usually wore a wrist brace/splint to help her carry more weight and reduce pain. R. 267.

At the administrative hearing in November 2015, Bergdoll testified that arthritis restricted her finger movement, which prevented her from gripping the steering wheel and being able to drive. R. 20. For the past year, she had driven only in the event of an emergency. *Id.* She had tried ice and heat, as well as some medication, for all her pain, but did not find it effective. R. 21–22. She used wrist splints once or twice a week when her wrists hurt. R. 23. She could get a regular sized can out of the cabinet, but anything larger she would drop. R. 26. Objects frequently slipped out of her hands because she could not grasp them. R. 31. She spent eight hours a day reclining and did not leave her home except to go to the doctor. R. 27–28.

12

B.  *Analysis*

Bergdoll asserts that ALJ Peltzer's RFC finding is not supported by substantial evidence and should be remanded. Pl.'s Br. 3–5. A claimant's RFC is the most she can do on a regular and continuing basis despite her impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *1. It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined limiting effects of impairments that are supported by the medical evidence or the claimant's credible complaints, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). The ALJ's RFC assessment "must include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion," *Mascio*, 780 F.3d at 636, and why she discounted any "obviously probative" conflicting evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977); *see also Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014).

Bergdoll's challenge concerns a specific component of the ALJ's RFC determination. She asserts that ALJ Peltzer should have found her capable of occasional, rather than frequent, handling and fingering, a finding which would eliminate the sedentary jobs identified by the VE and relied on by the ALJ at step five in concluding that she was not disabled. Pl.'s Br. 3–5; *see also* R. 35. Bergdoll contends that the ALJ failed to cite some of Dr. Hogenmiller's treatment notes. She argues that the ALJ should have given controlling weight to Dr. Hogenmiller's opinion, which Bergdoll characterizes as limiting her to at most occasional handling and fingering, and she faults the ALJ for relying on the opinion of DDS expert Dr. Surrusco. *See* Pl.'s Br. 4–5 (citing R. 930–31, 1094–96).

1.  *Medical Opinions*

13

The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical consultants. *See* 20 C.F.R. § 404.1527(c). A treating physician's opinion "is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see also* 20 C.F.R. § 404.1527(c)(2). An ALJ may reject a treating physician's opinion in whole or in part, however, if there is "persuasive contrary evidence" in the record. *Hines*, 453 F.3d at 563 n.2; *Mastro*, 270 F.3d at 178. The ALJ must "give good reasons" for discounting a treating physician's medical opinion. *See* 20 C.F.R. § 404.1527(c). In determining what weight to afford a treating physician's opinion, the ALJ must consider all relevant factors, including the relationship—in terms of length, frequency, and extent of treatment—between the doctor and the patient, the degree to which the opinion is supported or contradicted by other evidence in the record, the consistency of the opinion with the record as a whole, and whether the treating physician's opinion pertains to his or her area of specialty. *Id.*

Bergdoll asserts that Dr. Hogenmiller's opinion supports a limitation of no more than occasional handling and fingering. This argument, however, rests upon a faulty premise. Dr. Hogenmiller merely identified observations of tenderness in the PIP joints as support for his opinion, and he included a lifting, but not a manipulative, limitation. *See* R. 930–31. Thus, Bergdoll's argument that her RFC must have included a limitation of no more than occasional handling and fingering crumbles because the opinion she relies on did not actually include that limitation.

Moreover, ALJ Peltzer provided an adequate explanation of the medical evidence to support her RFC finding that Bergdoll could frequently handle and finger. R. 91. As to Dr. Hogenmiller's treatment notes, she explained that despite "not[ing] some findings of the hands," in his October 2013 opinion, he remarked during a visit three months later that Bergdoll "continued to have a 'very unusual exam of the hands.'" *Id.* (citing R. 1135). The ALJ identified Dr. Hogenmiller's observation from September 2013 that Bergdoll could bear weight on her hands with the wrists extended without severe discomfort. *Id.* (citing R. 1146). She also cited his February 2014 note that Bergdoll had only mild generalized swelling of the hands and his September 2015 note questioning whether Bergdoll had genuine inflammatory arthritis because she had no response to any biologics, displayed no hand swelling, and her chronic pain clouded examination of her hands. *Id.* (citing R. 1151, 1296, 1299).

Furthermore, the ALJ assigned great weight to Dr. Surrusco's "finding of frequent handling and fingering, but little weight [was] given to the remainder of the findings given more recently submitted medical evidence and testimony at the hearing." R. 90. The ALJ's analysis of Dr. Hogenmiller's treatment notes as to Bergdoll's hands and wrists is consistent with Dr. Surrusco's opinion, and Dr. Surrusco offered the only opinion evidence regarding Bergdoll's ability to handle and finger. Thus, it was permissible for the ALJ to rely on his opinion. *See Gordon*, 725 F.3d at 235 ("[T]he opinion of a non-examining physician can be relied upon when it is consistent with the record.").

Bergdoll nevertheless argues that the ALJ's RFC determination cannot be supported by substantial evidence because she did not cite Dr. Hogenmiller's treatment notes from May and June 2013 when weighing his opinion. Pl.'s Br. 4–5. Bergdoll contends that these notes—which documented severe pain on passive range of motion, especially in the PIP joints of the right

15

hand, Boutonniere deformity in the right fifth digit, and significant swelling in both hands—support Dr. Hogenmiller's October 2013 opinion. *Id.* This argument, however, does not show that the ALJ unreasonably relied on the treatment records that she cited, and Bergdoll essentially asks the Court to reweigh the evidence. Although Bergdoll is correct that the ALJ did not cite to these contrary treatment notes when *weighing* Dr. Hogenmiller's opinion, she did include them in the recitation of the medical evidence. *See* R. 85–90. This is not a situation then where the ALJ clearly failed to consider probative evidence, *see Reid*, 769 F.3d at 865, or improperly cherry-picked evidence to support a finding of non-disability, *see Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017). Rather, she identified the relevant evidence in the record and clearly explained that Dr. Hogenmiller's early opinion was not consistent with the bulk of his subsequent treatment notes. Resolving conflicts in the evidence is the ALJ's province, *see Davis v. Barnhart*, 392 F. Supp. 2d 747, 751 (W.D. Va. 2005) (citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)) ("[T]he Fourth Circuit has also admonished that it is the role of the ALJ, and not reviewing courts, to resolve conflicts in the evidence."), and this Court is not permitted to second guess the ALJ's weighing of the evidence so long as her factual findings are supported by substantial evidence in the record, *see Stevens v. Colvin*, No. 6:14cv21, 2015 WL 5510928, at *4 (W.D. Va. Sept. 16, 2015) ("[E]ven if the court would have made contrary determinations of fact, it must nonetheless uphold the ALJ's decision, so long as it is supported by substantial evidence.").

Accordingly, I find that the ALJ's decision to credit Dr. Surrusco's opinion of Bergdoll's ability to handle and finger over the opinion of Dr. Hogenmiller, which does not address this aspect of her functioning, is supported by substantial evidence.

2. *Severity of Symptoms*

Next, Bergdoll contends that the ALJ improperly evaluated her report of symptoms and limitations, which she argues were corroborated by Dr. Hogenmiller's treatment notes. Pl. Br. 5. She avers that Dr. Hogenmiller's notes from May and June 2013 support her testimony that she could not grip the steering wheel, used wrist splints once or twice a week, and dropped items because she could not grip them. Pl.'s Br. 5. To the extent Bergdoll infers that this testimony would support a greater limitation regarding her handling and fingering, this argument also fails.

The regulations set out a two-step process for ALJs to evaluate a claimant's symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529; *see also* SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996), *superseded on other grounds by* SSR 16-3p, 2016 WL 1119029 (Mar. 2, 2016). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866; *see also Craig*, 76 F.3d at 594. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *see Mascio*, 780 F.3d at 636–37. "The second determination requires the ALJ to assess the credibility of the claimant's statements about [her] symptoms and their functional effects." *Lewis*, 858 F.3d at 866. When conducting this two-step inquiry, the ALJ must consider "all the available evidence in the record" bearing on the claimant's allegations that she is disabled by pain or other symptoms caused by a medical impairment or related treatment. *See* 20 C.F.R. § 404.1529(c). The ALJ also must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5). Ultimately, the ALJ's articulated reasons for discounting a claimant's report of symptoms

need only be legally adequate and supported by substantial evidence in the record. *See Mascio*, 780 F.3d at 639; *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

In assessing the credibility of Bergdoll's report of symptoms, ALJ Peltzer explained that repeated physical examinations failed to reveal significantly decreased strength or sensation, as would be expected given the "significant functional limitations" Bergdoll alleged. R. 90. For example, despite displaying tenderness and occasionally decreased range of motion, Bergdoll generally had normal findings. *Id.* (citing R. 394); *see also* R. 579–80, 948, 1122 (findings related to strength and range of motion); R. 739–40, 1094, 1146, 1151, 1299 (findings of limited to no swelling). She was also "able to bear weight on her hands with the wrists extended." R. 90 (citing R. 1143–47). Additionally, none of the imaging or testing evidence supported claims about the extent or intensity of her symptoms. *Id.* (citing R. 1143–47); *see also* R. 793. These characterizations of the evidence are accurate. The ALJ also noted that Bergdoll's treatment was generally routine and conservative as she was treated with medications. R. 90; *see Dunn v. Colvin*, 607 F. App'x 264, 275 (4th Cir. 2015) ("[I]t is well established in this circuit that the ALJ can consider the conservative nature of a claimant's treatment in making a credibility determination . . . ."). Lastly, the record revealed many inconsistencies surrounding Bergdoll's physical pain and limitations, which the ALJ found further undermined her credibility. R. 90; *see Bishop*, 583 F. App'x at 68 (finding no error when "the ALJ cited specific contrary testimony and evidence in analyzing Bishop's credibility"). Bergdoll's examination of her hands in January 2014 was described as "unusual." R. 90 (citing R. 1132–35).[5] Dr. Hogenmiller expressed doubt as to whether Bergdoll had genuine inflammatory arthritis because of the lack of response to any

---

[5] The ALJ mistakenly attributed this finding to Dr. Hogenmiller's February 2014 treatment note in her credibility analysis, but she correctly noted when reciting the medical evidence that this observation occurred in January 2014. *See* R. 88–89.

biologics. *Id.* (citing R. 1296–1300). Bergdoll also did not report joint pain or swelling to NP Almarode in September 2015. R. 1274. Thus, the ALJ's reasoning for finding Bergdoll not entirely credible is legally adequate and supported by substantial evidence. *See generally* supra Pt. III.A.1.

## IV. Conclusion

For the foregoing reasons, I find that substantial evidence supports the Commissioner's final decision. Accordingly, the Court will **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 15, **AFFIRM** the final decision, and **DISMISS** this case from the docket. A separate Order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to all counsel of record.

ENTER: January 10, 2018

Joel C. Hoppe
United States Magistrate Judge